AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of New Jersey

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| FELIX CLARK, | ) | |
| a/k/a "Joseph Moore," | ) | 23-mj-7082 (EAP) |
| a/k/a "Stanley Smith" | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___June through September 2022___ in the county of ___Camden___ in the

___ District of ___New Jersey___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1349 | Wire fraud conspiracy, as more fully described in Attachment A |

This criminal complaint is based on these facts:

See Attachment B.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Christopher Shalvoy, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
<u>telephone</u> *(specify reliable electronic means)*.

Date: ___11/14/2023___

_____
*Judge's signature*

City and state: ___Camden, NJ___

Hon. Elizabeth A. Pascal, U.S. Magistrate Judge
_____
*Printed name and title*

CONTENTS APPROVED

UNITED STATES ATTORNEY

BY: _____
ELISA T. WIYGUL
Assistant United States Attorney


Date:    November 14, 2023

## ATTACHMENT A

## CONSPIRACY TO COMMIT WIRE FRAUD
### (18 U.S.C. § 1349)

From at least as early as June 2022 through in or around September 2022, in the District of New Jersey, and elsewhere, the defendant,

FELIX CLARK,
a/k/a "Joseph Moore,"
a/k/a "Stanley Smith,"

did knowingly and intentionally conspire and agree with ESTHER AMPPIAW and with uncharged co-conspirators, Co-Conspirator 1 ("CC-1") and others, in the devise of scheme and artifice to defraud Victim 1, and others, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain signs, signals, and sounds, including but not limited to, the electronic messages set forth below and as further described in Attachment B:

| DATE | SENDER | RECIPIENT | CONTENT |
|------|--------|-----------|---------|
| June 16, 2022 | CLARK | CC-1 | Photograph of handwritten love note from Victim 1 |
| June 16, 2022 | CLARK | CC-1 | Photograph of two $1,000 postal money orders from Victim 1 to "Dorothy Forson" |
| June 19, 2022 | CLARK | CC-1 | Request for age of "Dorothy" |
| June 19, 2022 | CLARK | Individual-1 | Request for false identification in the name of "Dorothy Forson" |
| June 26, 2022 | CLARK | CC-1 | Photograph of $1,000 and $500 postal money orders from Victim 1 to "Dorothy Forson Gerade" |
| June 26, 2022 | CLARK | CC-1 | Photograph of handwritten love note from Victim 1 |
| July 7, 2022 | CLARK | AMPPIAW | Screen shot of chat between CLARK and CC-1 regarding cashier's checks from Victim 1 to AMPPIAW |
| July 16, 2022 | CLARK | AMPPIAW | Tracking number for package from Victim 1 to CLARK's residence |

1

| DATE | SENDER | RECIPIENT | CONTENT |
|---|---|---|---|
| July 16, 2022 | AMPPIAW | CLARK | Photograph of back of check from Victim 1 to "Joseph Moore," endorsed by AMPPIAW in the name of "Joseph Moore" and later deposited into a "Joseph Moore" bank account |
| August 5, 2022 | AMPPIAW | CLARK | Photograph of handwritten note from Victim 1 to "Joseph Moore" that accompanied two $5,000 checks from Victim 1 to "Moore" |
| August 5, 2022 | CLARK | CC-1 | Photograph of handwritten note from Victim 1 to "Joseph Moore" that accompanied two $5,000 checks from Victim 1 to "Moore" |
| August 5, 2022 | AMPPIAW | CLARK | Photograph of receipt for deposit of $10,000 from Victim 1 into "Joseph Moore" bank account |
| September 8, 2022 | CLARK | AMPPIAW | Photograph of postal receipt with tracking number from Victim 1 that CC-1 had sent CLARK |
| September 8, 2022 | AMPPIAW | CLARK | Photograph of five $15,000 checks from Victim 1 to "Joseph Moore" with the memo line "Dorothy Forson Fine" and handwritten note from Victim 1 |
| September 9, 2022 | AMPPIAW | CLARK | Photograph of bank deposit slip for the five $15,000 checks from Victim 1 into a "Joseph Moore" bank account |

Contrary to Title 18, United States Code, Section 1343, in violation of Title 18, United States

Code, Section 1349.

2

## **ATTACHMENT B**

I, Christopher Shalvoy, being first duly sworn, hereby depose and state as follows:

## **INTRODUCTION AND AGENT BACKGROUND**

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since September 2021. I am currently assigned to the Philadelphia Field Division, South Jersey Resident Agency. During my tenure as an FBI Agent, I have conducted or assisted in numerous investigations that have resulted in the arrests of individuals who have violated federal law. Through my training and experience, I have become familiar with a variety of fraudulent schemes and the federal statutes prohibiting such fraudulent activity.

2.      The information contained in this Affidavit is based on my personal knowledge and observation; my training and experience; reports and information I have received from others participating in the investigation; victim interviews; surveillance; and review of records and documents. Because this Affidavit is being submitted for the limited purpose of establishing probable cause to issue a complaint, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to support the charge in the complaint. Unless specifically indicated, all conversations and statements described in this Affidavit are related in substance and in part. When I assert an event took place at a specific time of day, I am asserting that it took place at UTC (Coordinated Universal Time), unless otherwise noted. Where I assert that an event took place on a particular date or at a particular time, I am asserting that it took place on or about the date or time asserted. Similarly, where I assert that an event took place a certain number of times, I am asserting that it took place approximately that number of times. In addition, where I assert a

certain dollar amount for particular transaction(s), I am asserting that the transaction(s) involved approximately that amount. All emails, text messages, and other materials quoted in this Affidavit bear the same spelling, punctuation, and grammar as found in the originals of these records.

<u>Summary of Romance Fraud Scheme</u>

3.　　　　In October 2022, the FBI became aware of an international internet-based romance fraud scheme preying on lonely victims, many of them elderly. The FBI was first alerted to this scheme via the complaint of an elderly victim who resides in New Jersey ("Victim 1"). Subsequent investigation has determined that various individuals, believed to be located in Ghana, tricked their victims into mailing checks and money orders to individuals—including but not limited to defendant FELIX CLARK, charged herein, and defendant ESTHER AMPPIAW, charged elsewhere—at CLARK's residence in Delray Beach, Florida ("CLARK's Residence"); making transfers via PayPal (including to an account belonging to AMPPIAW); and wire transfers to various bank accounts (not belonging to CLARK or AMPPIAW, based on the investigation to date).

4.　　　　Based on my training, experience, and conversations with other law enforcement officers that are familiar with romance fraud schemes originating from overseas, I know that the co-conspirators often direct U.S.-based victims to send funds to U.S.-based individuals, generally for the purpose of laundering the proceeds to avoid detection. While such individuals are sometimes unknowing conduits for the funds, at least initially, many are knowing co-conspirators in the fraud. After receiving funds from U.S.-based victims, these individuals

transfer these funds to other individuals and/or accounts, sometimes located within the United States and sometimes located abroad.

5.      As described in greater detail herein, the investigation by the FBI and U.S. Postal Inspection Service ("USPIS") investigation to date has determined that Victim 1, a then-76-year-old New Jersey-based victim, has lost over $650,000—of which approximately $280,000 was mailed to CLARK's Residence in the form of checks or money orders made out to AMPPIAW, CLARK's alias "Joseph Moore," and others—and "Victim 2," a then-69-year-old New-Jersey-based victim, has lost approximately $80,000 to this scheme—of which approximately $41,000 was mailed to CLARK's Residence in the form of blank $1,000 money orders that were then made out to AMPPIAW (totaling $33,000) and CLARK (totaling $8,000), and of which approximately $15,500 was sent to AMPPIAW's PayPal account and some of which was subsequently transferred to AMPPIAW's bank account at Bank 1. The investigation has also identified evidence of other U.S.-based victims of what appear to be the same, or similar, scheme, who have all been duped out of thousands of dollars.

**CLARK and AMPPIAW Knowingly Participate in and Receive Proceeds of Fraud**

6.      The investigation has revealed that AMPPIAW and CLARK aliases "Joseph Moore," and "Stanley Smith" (i) received fraudulently-induced checks from Victim 1 ("Victim 1 Checks") at CLARK's Residence, (ii) deposited Victim 1 Checks, and/or (iii) appeared to receive proceeds from Victim 1 Checks. The investigation has also revealed that AMPPIAW and CLARK (i) received fraudulently-induced Victim 2 Money Orders at CLARK's Residence, (ii) deposited Victim 2 Money Orders, and/or (iii) appeared to receive proceeds from Victim 2 Money Orders.

3

7.     In total, Victim 1 mailed approximately 23 checks totaling more than $275,000 to CLARK's Residence between in or around June 2022 and in or around September 2022. Of these, approximately six checks were made out to AMPPIAW (misspelled as "Ampiaw") between June 17 and July 22, 2022—just over one month—totaling $24,500. Bank statements appear to reflect that approximately $14,000 of these checks were deposited into an account at Bank 2 owned and operated by AMPPIAW. The memo lines on three of the checks contained a reference to "Dorothy Forson," which is the name used by the individual, believed to be "CC-1," who was corresponding with Victim 1, as described below.

8.     The other approximately 17 checks, totaling more than $250,000 between July 15 and September 7, 2022—less than two months—were made out to "Joseph Moore," which the investigation has revealed is a fake persona used by CLARK, as explained in more detail below. All but one of the checks made out to "Joseph Moore" contained a reference to "Dorothy Forson" in the memo line. All of the checks were deposited into bank accounts held in the name of "Moore."

9.     Based on WhatsApp chats on an iPhone belonging to CLARK ("CLARK's iPhone") that law enforcement obtained via a search warrant executed on CLARK's Florida Residence on June 28, 2023 (the "Residential Search Warrant"), as described in more detail below, CLARK and AMPPIAW knew that the funds they were receiving were from Victim 1, a resident of New Jersey, who believed that he was sending funds to or for the benefit of a romantic interest. CLARK also knew that CC-1, with whom CLARK had extensive correspondence over WhatsApp, was personally making such misrepresentations to Victim 1 or causing others to do so. All chats between CLARK and AMPPIAW and between CLARK and

CC-1 described herein occurred over WhatsApp and were recovered from CLARK's iPhone pursuant to the Residential Search Warrant, unless otherwise noted.

<u>Victim 1</u>

10.     Victim 1's spouse died in March 2022. In June 2022, Victim 1, who was lonely and seeking companionship, was a member of a dating website catering to widows and widowers. Victim 1 began privately messaging with an individual going by the name "Dorothy Forson" and purporting to be a woman looking for a relationship.

11.     "Dorothy Forson," who law enforcement officers believe is in fact a co-conspirator based overseas ("CC-1"), subsequently began using SCAM E-MAIL 1 to communicate with Victim 1 via both e-mail and Google Chat, which is an instant-messaging service provided to Google email ("Gmail") users. Over the course of a few days, "Dorothy Forson" gained the trust and affection of Victim 1 through the exchange of hundreds of emails and chat messages. "Dorothy Forson" and Victim 1 quickly professed their love for each other and discussed getting married.

<u>June 13, 2022-June 26, 2022</u>

12.     In or around mid-June 2022, "Dorothy Forson" (using SCAM E-MAIL 1) told Victim 1 that she had been in a car accident and stated that the accident would cost her a lot of money, which she did not have. Victim 1 ultimately agreed to pay for "Dorothy Forson"'s purported car accident-related expenses.

13.     "Dorothy Forson" asked Victim 1 to send approximately $2,000 to a particular PayPal account, and Victim 1 did so, as confirmed by records received from PayPal.

14.    "Dorothy Forson" also asked Victim 1 to send $2,000 in money orders to CLARK's Residence in Delray Beach, Florida. "Dorothy Forson" told Victim 1 that she would be in Florida at that time, but she instructed Victim 1 to leave the addressees in the money orders blank.

15.    On June 16, 2022, CLARK sent CC-1 a photograph of two $1,000 Postal money orders from Victim 1. This photograph reflected that the money orders had been made out to "Dorothy Forson," contrary to the instructions that "Dorothy" had given to Victim 1 to leave the addressees blank.

16.    CLARK also sent CC-1 a photograph of a post-it note bearing the handwritten message: "I Love U / Miss You Sweetheart [Victim 1] xoxo." Based on this investigation, during which I have reviewed numerous items handwritten by Victim 1, I believe this handwriting is Victim 1's.

17.    Within minutes, "Dorothy Forson" wrote Victim 1 to say the money orders had arrived. "Dorothy Forson" chided Victim 1 for writing her name on the money orders, contrary to her instructions, stating that "one person can only cash $1000 a day."

18.    On June 17, 2022, a purported "uncle" of "Dorothy Forson" used SCAM E-MAIL 1[1] to tell Victim 1 that he and "Dorothy" had located a car to replace the one that "Dorothy" had purportedly damaged in the accident. The "uncle" told Victim 1 that the cost of the new car was $5,500. Victim 1 subsequently mailed a $5,500 check, made out to AMPPIAW (spelled

---

[1] This uncle, who was known to Victim 1 as "James Forson" or "James Forson Gerade," also used a separate e-mail address, SCAM E-MAIL 2, to correspond with Victim 1 at certain times. A purported family attorney for "Dorothy" and "James" also used SCAM E-MAIL 3 to correspond with Victim 1 regarding the purported gold.

"Ampiaw" at "Dorothy"'s instruction), to CLARK's Residence. CC-1 told CLARK to expect the check and sent CLARK an image of the check.

19.    On June 18, 2022, "Dorothy" told Victim 1 over Google Chat about a large quantity of gold located in Ghana that her alleged "uncle" allegedly owned. "Dorothy" told Victim 1 that the gold had incurred a "storage debt" of $50,000 that had to be paid before the gold would be released.

20.    Victim 1 responded with an offer to send the $50,000 so the gold could be released. "Dorothy" responded that if Victim 1 did so, then "Dorothy" and "James" would give Victim 1 90% of the gold, but "Dorothy" asked Victim 1 to send $60,000—$50,000 for the storage debt plus another $10,000 to cover travel expenses to Ghana for both "Dorothy" and her "uncle," "James."

21.    Later that day, at approximately 20:52, "Dorothy" wrote to Victim 1, "when you get some money and time, please send me something so I can keep on myself. Is not everything I will ask from my uncle. He has been supportive for long but sometimes i feel sly to ask him for money. Am old enough to work and take care of myself." Victim 1 responded that he wanted to open a bank account for "Dorothy" so she could be "independent." Minutes later, "Dorothy" wrote to Victim 1, "I can't wait to see you. I can't wait to hold you to my heart. Can't wait to be close to you… If you can Monday try and mail me some money. Maybe $2000 so I can keep it till we meet. Money order will be the best." Less than an hour later, "Dorothy" increased the request to $5,000.

22.    Victim 1 expressed concern that "Dorothy" had asked Victim 1 for thousands of dollars within two weeks, that they had never met, and that this might be a "scam." However,

after "Dorothy" expressed sadness that Victim 1 did not trust "her" and told Victim 1 that "she" was crying, Victim 1 agreed to send more money. Victim 1 wrote that he had obtained a postal money order for $2,000 and had mailed it to what he believed was "Dorothy's" address but which was actually CLARK's Residence.

23.    On June 19, 2022, CLARK asked CC-1, "What's Dorothy's age?" CC-1 responded, "33" and then "Dem tell am say 33." Based on the context and this investigation, I believe this exchange shows that CLARK knew that Victim 1 was being told that the money he was sending was for a "Dorothy" (who CLARK knew did not exist) who was supposedly 33 years old.

24.    On that same day, based on records obtained from CLARK's iPhone pursuant to the Residential Search Warrant, CLARK messaged an individual ("Individual-1")—who appears to have previously provided false identification to CLARK for "Moore" and "Smith," among other identities—to obtain false identification for "Dorothy Forson." CLARK provided his own date of birth in 1989 to Individual-1 as the date of birth for "Dorothy Forson"—which would make "Dorothy" 33 years old, just as CC-1 stated.

25.    Meanwhile, CLARK and CC-1 corresponded repeatedly about making arrangements to be able to receive $50,000 or $60,000 (which "Dorothy" had discussed with Victim 1 beginning June 18, 2022, as described above), with CC-1 asking whether AMPPIAW could receive $50,000.

26.    On June 24, 2022, "Dorothy" asked Victim 1 to mail another $2,000 in money orders to CLARK's Residence because the previous $2,000 had not yet been delivered, apparently because Victim 1 had not included an apartment number in the address, nor obtained

8

tracking. Victim 1 stated that he was sending an additional $1,500 at that time because that was all he had on hand.

27.     On June 25, 2022, CC-1 told CLARK to expect a delivery of a money order and later told CLARK that the delivery had arrived—presumably based on tracking information that had been provided by Victim 1.

28.     On June 26, 2022, CLARK sent CC-1 a photo of two postal money orders—one for $1,000 and one for $500—made out from Victim 1 to "Dorothy Forson Gerade" at CLARK's Residence, with a post-it note bearing the handwritten message: "Wife I love You. Husband xoxo." Based on this investigation, I believe this handwriting is Victim 1's. "Dorothy" told Victim 1 that the $1,500 in money orders had arrived.

29.     On that same date, AMPPIAW asked CLARK, "Pls what is passcode for the [Bank 3] card?" CLARK responded with a four-digit code. According to a review of bank records, AMPPIAW did not have an account at Bank 3, but "Joseph Moore" did.

30.     On June 27, 2022, a cash withdrawal was made from a Bank 3 account held in the name of "Moore" from an ATM in Delray Beach, Florida. Based on travel records, CLARK was outside the United States at the time.

31.     Throughout the summer, "Dorothy" continued to communicate with Victim 1, telling him that "she" loved him and asking for more and more money in relation to the purported gold investment and other purported expenses, such as living and travel funds. Sometimes, "Dorothy" instructed Victim 1 to send funds to CLARK's Residence via checks and/or money orders made out to AMPPIAW, and Victim 1 did so. Some of those checks and/or money orders ultimately were deposited into AMPPIAW's own bank accounts.

<u>July 7, 2022</u>

32.     The evidence reveals that AMPPIAW was well aware of these incoming payments made out to her. For instance, on or about July 7, 2022, "Dorothy" asked Victim 1 for $5,000 in cashier's checks, divided into one $3,000 check and one $2,000 check, to be mailed to CLARK's Residence.

33.     That same day, CLARK (who was still abroad) sent AMPPIAW a screen shot of the following chat between CLARK and CC-1:

| | |
|---|---|
| CC-1: | $5000 check sent |
| | $2000 & $3000 |
| | Cashier checks |
| | Delivery tomorrow |
| CLARK: | Ok bro |
| CC-1: | Esther name [referencing AMPPIAW] |
| CLARK: | Ok.. my address right? |
| CC-1: | Yes |
| | Out for delivery |
| CLARK: | Ok bro |
| CC-1: | We for do the payment fast fast so they can send the 60k to Joseph |
| | Pls n pls let do everything possible to pay them fast |

34.     CLARK and AMPPIAW then exchanged numerous text messages about transfers in cedis, Ghanaian currency.

<u>July 16, 2022</u>

35.     On or about July 16, 2022, at approximately 10:09 a.m., CLARK sent AMPPIAW a tracking number for a package from Victim 1 to CLARK's Residence.

36.     That same day, at approximately 8:30 p.m., AMPPIAW sent CLARK a photo of a piece of paper on which AMPPIAW appeared to be practicing signatures for "Joseph Moore," followed by a photo a few minutes later of a signature on the back of a check.

10

37.     Two days later, on July 18, 2022, a Victim 1 Check for $69,381 made out to "Moore" was deposited into a bank account held in the name of "Moore." The image of the back of the check contained in the bank's records matches the image of the check that AMPPIAW sent to CLARK. CLARK was still abroad at that time.

August 4, 2022-August 5, 2022

38.     On August 4, 2022, "Dorothy Forson" told Victim 1 that "she" needed $10,000 to get a plane ticket and pay other bills. "Dorothy" told Victim 1 to mail the funds to CLARK's Residence but told Victim 1 at 12:40 p.m. that "she" had to "talk to Esther."

39.     At 12:41 p.m., CC-1 wrote to CLARK, "Esther or Joseph Moore / $10k," and seconds later, "Which one do u want[?]" At 12:46 p.m., CLARK responded, "Joseph." Based on my training and experience, I believe CC-1 was advising CLARK that a $10,000 payment would be coming soon and asking CLARK whether it should be made out to AMPPIAW or to "Joseph Moore." CLARK instructed CC-1 that the payment should be made out to "Joseph Moore."

40.     At 1:22 p.m., "Dorothy" relayed CLARK's instruction, telling Victim 1 that "Esther won't be available so you have to sign it in Joseph Moore name" and instructing Victim 1 to address the envelope to "Joseph Moore."

41.     Victim 1 responded, "ok I just have to figure it out on my end where I am going to get it as i said we are at the bottom of the Barrel and I don't like working this close as there is no margin of error   So you think next friday we will have the funds for the sale of the product [the gold]."

42.     CC-1 provided the tracking number for Victim 1's package to CLARK, who forwarded it to AMPPIAW. CC-1 told CLARK the package had been delivered, which CLARK

11

relayed to AMPPIAW. CLARK asked AMPPIAW to pick up the check and get it deposited before she went to work. AMPPIAW responded that she would do so.

43.    On August 5, 2022, at 10:22 a.m., AMPPIAW sent CLARK a photograph of a post-it note bearing the handwritten message: "Thank you Mr Moore for helping uncle James & Dorothy / Please send me a email address and cell # Thanks [Victim 1] [Victim 1's e-mail address]." AMPPIAW also sent CLARK a receipt reflecting a $10,000 deposit at Bank 3. Bank 3 records show a deposit into a "Moore" account of two $5,000 checks on that same date.

44.    Minutes later, CLARK sent CC-1 a photograph of the same post-it note, along with a photograph of two $5,000 checks made out from Victim 1 to "Joseph Moore," with the memo line, "Dorothy Forson."

September 2, 2022-September 9, 2022

45.    On September 2, 2022, CLARK—who was outside the United States at the time—messaged AMPPIAW, "Plss deposit it b4 u go home wai." Less than a minute later, he wrote, "Delete the pics for all of us" and then minutes later asked AMPPIAW to delete another picture or message. In fact, several messages from AMPPIAW before and after this request from CLARK are deleted from the WhatsApp chat. On September 7, 2022, CLARK asked AMPPIAW to send funds using an online payment platform to CC-1, and AMPPIAW confirmed that she had done so.

46.    On September 5, 2022, "Dorothy" told Victim 1 that a large fine had been incurred in relation to the process of getting the gold in Ghana released, and that "we" (which I believe means "Dorothy" and her "uncle," "James") supposedly were under house arrest in Ghana until it was paid. Over the new few days, "Dorothy" and Victim 1 discussed the purported

"fine" and other expenses that "Dorothy" told Victim 1 were necessary to release the gold and/or provide for her and her associates' living and/or travel expenses. "Dorothy" stated at one point that the house arrest had been at least partially lifted.

47.     Victim 1 told "Dorothy" that he was out of money in his personal and business bank accounts, having already sent approximately $500,000. He told "Dorothy" that all he had left was a credit line with a financial services company, on which he would draw to send funds for payment of the purported fine. Victim 1 later told "Dorothy," "my house is on the line for that credit line."

48.     On September 6, 2022, Victim 1 told "Dorothy" that he would mail four $15,000 checks, for a total of $60,000, but the checks could not be cashed for three days while he waited for funds to arrive. The next day, "Dorothy" told Victim 1 that the fine would be $67,943 and must be paid within one week. Victim 1 told "Dorothy" that he was mailing the funds along with a note not to cash the checks right away.

49.     On September 8, 2022, CLARK sent AMPPIAW a photo of a postal receipt from Deptford, New Jersey that CC-1 had sent CLARK that showed a tracking number. A few hours later, AMPPIAW sent CLARK a photograph of five $15,000 checks from Victim 1 made out to "Joseph Moore," with the memo line "Dorothy Forson Fine," along with a handwritten note from Victim 1. This note provided Victim 1's name and e-mail address and, based on my review of documents, was written in Victim 1's handwriting. The note instructed "Moore" not to deposit the checks "until you hear from Dorothy as we are waiting for [the financial services company] to fund acct."

50.    "Dorothy" confirmed to Victim 1 that "Mr. Moore" had reported receiving the checks and asked when the checks could be cashed. Victim 1 responded that the checks could be cashed the following day, September 9. On September 9, AMPPIAW sent CLARK a photograph of a Bank 3 deposit slip showing the deposit of the five $15,000 checks into a "Moore" bank account.

51.    AMPPIAW's WhatsApp chat with CLARK revealed numerous additional communications demonstrating that AMPPIAW was well-informed as to the fraudulent nature of the defendants' activities. For instance, CLARK sent AMPPIAW the USPS tracking number for multiple packages sent by Victim 1 to CLARK's Residence. Additionally, AMPPIAW frequently sent CLARK photographs of handwritten calculations that appear to be analyses of how much money CLARK and AMPPIAW would keep from the transactions with CC-1.

CLARK and AMPPIAW made large transfers to each other after receiving Victim 1 Checks

52.    The following are examples of how victim funds were transferred by AMPPIAW and CLARK after receipt. While there is often not a one-to-one correspondence between in-flows and out-flows, a financial analysis reveals that the victim funds were often moved among multiple accounts belonging to AMPPIAW, CLARK, or CLARK's alias "Joseph Moore," as well as being taken out in cash or transferred using online payment platforms to known and unknown recipients—including overseas, based in part on WhatsApp communications obtained from CLARK's iPhone seized in the Residential Search Warrant.

53.    Based on bank records obtained during the investigation, every check Victim 1 sent to CLARK's Residence made out to "Joseph Moore" was deposited into one of multiple bank accounts in the name of "Moore." Within a few days of each such deposit and often almost

14

immediately, "Joseph Moore" typically made multiple cash withdrawals and transfers to AMPPIAW's and/or CLARK's accounts.

54.     For example, as noted above, on Thursday, August 4, 2022, Victim 1 sent two checks overnight via USPS to the CLARK's Residence. The checks were deposited into a "Joseph Moore" bank account on Friday, August 5, 2022. "Joseph Moore" immediately transferred funds to CLARK. On Monday, August 8, 2022, three separate $1,000 cash withdrawals were made from a "Moore" account at two ATM locations, and on August 9, 2022, an additional $1,000 cash withdrawal was made. On August 8, 2022, a "Moore" account also made two $1,000 transfers to AMPPIAW's bank account.

55.     Overall, bank records obtained during the investigation revealed that, during the time period that "Joseph Moore" received checks from Victim 1 (totaling more than $250,000), AMPPIAW's bank account(s) received $27,000 via transfers from "Moore" and CLARK's bank account(s) received $35,000 via wires or transfers from "Moore," all typically shortly after the date "Moore" received a check from Victim 1.

56.     The flow of funds also went in the other direction. AMPPIAW received Victim 1 Checks totaling approximately $24,500. According to bank records, during the time period that AMPPIAW's bank account received Victim 1 Checks, CLARK's bank account(s) received approximately $10,000 via transfers from AMPPIAW's bank account, typically shortly after the date on which AMPPIAW received a Victim 1 Check.

CLARK Created the False Personas "Joseph Moore" and "Stanley Smith" to Further the
Fraudulent Scheme

57.     Prior to executing the Residential Search Warrant at CLARK's Residence, the
investigation obtained records for certain bank and other financial accounts in the name of
"Moore" or of an LLC owned by "Smith." The records reflected that, among other things:

    a.  The identification provided for "Moore" and "Smith" in opening those accounts
      contained photographs matching CLARK.

    b.  CLARK's true date of birth had been provided as the dates of birth for both
      "Moore" and "Smith."

    c.  Non-existent Social Security numbers and driver's license numbers had been
      provided for both "Moore" and "Smith," based on checks with the Social Security
      administration and a review of public records.

58.     Upon executing the Residential Search Warrant at CLARK's Residence, law
enforcement officers located driver's licenses (with CLARK's photograph), social security cards,
and numerous bank cards and financial account statements, all in the names of "Joseph Moore"
and "Stanley Smith." Officers also found financial mail addressed to other names of individuals
who did not live at CLARK's Residence.

CLARK and AMPPIAW make false statements regarding the mailings to CLARK's Residence
and the funds flowing through CLARK's and AMPPIAW's accounts

*AMPPIAW's citizenship interview*

59.     AMPPIAW is in the process of applying to become a United States citizen.

60.     On June 1, 2023, AMPPIAW was interviewed by United States immigration
officials. AMPPIAW stated, in substance and in part, that CLARK was her boyfriend, that she

16

has not received any directions from another person to send or receive money, and that she has not received money from individuals she does not know. AMPPIAW stated that she sends family members in Ghana approximately $100 per week and that any money she receives other than from her employment is from co-workers to whom she had lent money.

*CLARK's interview with law enforcement on June 28, 2023*

61.    On June 28, 2023, the same day the Residential Search Warrant was executed, law enforcement officers engaged in voluntary separate interviews with CLARK and AMPPIAW. The interview of CLARK took place at his Residence, before officers executed the Residential Search Warrant, and was recorded. CLARK stated, in substance and in part, that he had not heard of "Joseph Moore" or "Stanley Smith." CLARK then stated that he recalled receiving one or two mailings for "Moore," and that he placed these mailings back in the mail to be returned to sender. CLARK stated that he had never given money to, or received money from, Victim 1, Victim 2, CC-1, "Moore," or "Smith." He repeatedly denied knowing who any of these individuals were. CLARK also stated that AMPPIAW was his fiancée.

*AMPPIAW's interview with law enforcement on June 28, 2023*

62.    The interview of AMPPIAW took place in a parking lot. The interview was recorded. AMPPIAW stated, in substance and in part, that she did not want to disclose the nature of her relationship to CLARK. AMPPIAW denied knowing who "Joseph Moore," "Stanley Smith," Victim 1, or Victim 2 were. She stated that CLARK gave her money "once in a while" in the range of $80-$100 each time, which she would later repay. AMPPIAW admitted that the endorsements on several Victim 1 Checks made out to her were in fact her signature and that the

handwriting on the face of one money order from Victim 2, and the endorsement on that money order, were her own.

63.      AMPPIAW claimed that she did not check all of her bank accounts often, but she stated that she checked her Bank 2 account daily. As noted above, approximately $14,000 in Victim 1 Checks were deposited into AMPPIAW's Bank 2 account during June and July 2022—an amount nearly 40% of AMPPIAW's total legitimate wages during the entire second and third quarters of 2022 combined, according to Florida state records.

64.      Accordingly, there is probable cause to believe that both CLARK and AMPPIAW knowingly joined in a conspiracy to commit mail and wire fraud.

### CLARK ATTEMPTS TO OBSTRUCT JUSTICE

65.      At a certain point during the consensual interview of CLARK before the execution of the Residential Search Warrant, CLARK stated that he wished to consult an attorney, so the undersigned and the other agent ceased questioning him. CLARK stated that he wished to cooperate and provide more information to the FBI in the future. The undersigned and another FBI agent gave CLARK our contact information and said that CLARK or his attorney could contact us to discuss the matter further.

66.      Among the items law enforcement officers seized pursuant to the Residential Search Warrant from CLARK's Residence on June 28, 2023 was CLARK's U.S. passport.

67.      In late July 2023, CLARK claimed that he needed his passport back because he had preplanned travel to Ghana on Monday, July 31, in order to attend the funeral of a close relative.  CLARK subsequently submitted email documents showing travel bookings that had been made before the Residential Search Warrant execution for a flight from Miami to Ghana

leaving July 31, 2023, and a flight (separately booked) from Ghana to Dallas leaving August 31, 2023. In addition, CLARK submitted a document called "Funeral Flyer.jpeg," which purported to show various funeral-related proceedings from August 3, 2023 through August 7, 2023 for an individual with the last name Clark (the "Relative"), with a date of birth in 1958 and a date of death of April 21, 2023, and listing the Relative's immediate relatives, including CLARK.

68.     A review of CLARK's iPhone seized during the Residential Search Warrant corroborates that CLARK purchased the tickets to and from Ghana in two separate transactions before the execution of the Residential Search Warrant.

69.     CLARK subsequently submitted a purported death certificate for "Name of Decessed [sic]" [the Relative], date of death April 21, 2023, from a particular hospital (the "Hospital") in Ghana. The death certificate purported to bear the signatures of "Dr. [Individual-2], Midical [sic] Director" and "Mr. Barrister [Individual-3], Witner [sic]," and to be "Approved by" the "Republic of Ghana Ministry of Health."  This document contained typographical errors and failed to list certain information, such as the decedent's date of birth.

70.     A representative of the Hospital subsequently stated that the purported death certificate was not authentic and that no individual by the name of the Relative had died at their facility on April 21, 2023.

71.     Accordingly, there is probable cause to believe that CLARK attempted to obstruct justice by submitting a false and fraudulent document, after he was aware of an investigation against him, for the purpose of inducing the United States to release his passport to him so that he could flee to Ghana.

Respectfully submitted,

CHRISTOPHER SHALVOY
Special Agent, Federal Bureau of Investigation

Attested to by telephone pursuant to Fed. R. Crim. P. 4.1(b)(2)(A) on November 14, 2023, in the
District of New Jersey.

HONORABLE ELIZABETH A. PASCAL
United States Magistrate Judge